TJOFLAT, Circuit Judge:
The Governor of the State of Florida, other Florida officials, and members of the Board of Medicine of the Florida Department of Health (collectively, the “State”), appeal from the District Court’s grant of summary judgment and an injunction in favor of a group of physicians and physician advocacy groups (collectively, “Plaintiffs”) enjoining enforcement of Florida’s Firearm Owners Privacy Act[1] (the “Act”) on First and Fourteenth Amendment grounds.
The Act seeks to protect patients’ privacy by restricting irrelevant inquiry and record-keeping by physicians regarding firearms. The Act recognizes that when a patient enters a physician’s examination room, the patient is in a position of relative powerlessness. The patient must place his or her trust in the physician’s guidance, and submit to the physician’s authority. In order to protect patients, physicians have for millennia been subject to codes of conduct that define the practice of good medicine and affirm the responsibility physicians bear. In keeping with these traditional codes of conduct — which almost universally mandate respect for patient privacy — the Act simply acknowledges that the practice of good medicine does not require interrogation about irrelevant, private matters.
As such, we find that the Act is a legitimate regulation of professional conduct. The Act simply codifies that good medical care does not require inquiry or record-keeping regarding firearms when unnecessary to a patient’s care. It is uncontroversial that a state may police the boundaries of good medical practice by routinely subjecting physicians to malpractice liability or administrative discipline for all manner of activity that the state deems bad medicine, much of which necessarily involves physicians speaking to patients. Although the Act singles out a particular subset of physician activity as a trigger for discipline, this does little to alter the analysis. Any burden the Act places on physician speech is thus entirely incidental. Plaintiffs remain free — as physicians always have been — to assert their First Amendment rights as an affirmative defense in any actions brought against them. But we will not, by striking down the Act, effectively hand Plaintiffs a declaration that such a defense will be successful. Furthermore, when the Act is properly understood as a regulation of physician conduct intended to protect patient privacy and curtail abuses of the physician-patient relationship, it becomes readily apparent from the language of the Act the type of conduct the Act prohibits. Accordingly, we reverse the District Court’s grant of summary judgment in favor of Plaintiffs, and vacate the injunction against enforcement of the Act.
I.
On June 2, 2011, Florida Governor Rick Scott signed the Act into law. The Act created Fla. Stat. § 790.338, entitled “Medical privacy concerning firearms; prohibitions; penalties; exceptions,” and amended the Florida Patient’s Bill of *1204 Rights and Responsibilities, Fla. Stat. § 381.026, to include several of the same provisions. The Act also amended Fla. Stat. § 456.072, entitled “Grounds for discipline; penalties; enforcement,” to provide for disciplinary measures for violation of the Act. The Florida legislature passed the Act in response to complaints from constituents that medical personnel were asking unwelcome questions regarding firearm ownership, and that constituents faced harassment or discrimination on account of their refusal to answer such questions or simply due to their status as firearm owners.[2]
The Act provides, in relevant part, that licensed health care practitioners and facilities (i) “may not intentionally enter” information concerning a patient’s ownership of firearms into the patient’s medical record that the practitioner knows is “not relevant to the patient’s medical care or safety, or the safety of others,” § 790.338(1); (ii) “shall respect a patient’s right to privacy and should refrain” from inquiring as to whether a patient or his or her family owns firearms, unless the practitioner or facility believes in good faith that the “information is relevant to the patient’s medical care or safety, or the safety of others,” § 790.338(2); (iii) “may not discriminate” against a patient on the basis of firearm ownership, § 790.338(5); and (iv) “should refrain from unnecessarily harassing a patient about firearm ownership,” § 790.338(6).[3]
*1205 Violation of any of the provisions of the Act constitutes grounds for disciplinary action under § 456.072(2). § 456.072(l)(nn). Furthermore, “[violations of the provisions of subsections (l)-(4) constitute grounds for disciplinary action under [Fla. Stat. §§ ] 456.072(2) and 395.1055.” § 790.338(8). Thus, if the Board of Medicine of the Florida Department of Health (the “Board”) finds that a practitioner has violated the Act, the practitioner faces disciplinary measures including fines, restriction of practice, return of fees, probation, and suspension or revocation of his or her medical license. § 456.072(2). An investigation culminating in disciplinary action may be initiated against a practitioner by the Department of Health or may be triggered by a citizen’s complaint. § 456.073. The minutes of a June 2, 2011, meeting of the Rules/Legislative Committee of the Board indicate that the Board is prepared to initiate disciplinary proceedings against a practitioner who violates the Act, stating that “the Committee [has] determined [that] violation of [the Act] falls under failure to comply with a legal obligation and the current disciplinary guidelines for this violation would apply.” Doc. 87, at 5.
On June 6, 2011, four days after Governor Scott signed the Act into law, Plaintiffs filed a 42 U.S.C. § 1983 action against the State in the United States District Court for the Southern District of Florida, alleging that the inquiry, record-keeping, discrimination, and harassment provisions of the Act facially violate the First and Fourteenth Amendments of the United States Constitution, and seeking declaratory and injunctive relief. Plaintiffs contended that the Act imposes an unconstitutional, content-based restriction on speech, is over-broad, and is unconstitutionally vague.
On September 14, 2011, finding that Plaintiffs were likely to succeed on the merits, the District Court preliminarily enjoined enforcement of the inquiry, record-keeping, discrimination, and harassment provisions of the Act, together with the provisions providing for discipline of practitioners who violate the Act. Wollschlaeger v. Farmer, 814 F.Supp.2d 1367, 1384 (S.D.Fla.2011) (citing §§ 456.072(1)(nn), (2), 790.338(1), (2), (5), (6), (8)).
On June 2, 2012, the District Court permanently enjoined enforcement of the inquiry, record-keeping, discrimination, and harassment provisions of the Act — together with the related disciplinary provisions — holding, on cross motions for summary judgment, that all four provisions facially violated the First Amendment, and that the inquiry, record-keeping, and harassment provisions of the Act were void for vagueness. Wollschlaeger v. Farmer, 880 F.Supp.2d 1251, 1267-69 (S.D.Fla.2012) (citing §§ 456.072(1)(nn), (2), 790.338(1), (2), (5), (6), (8)).
The District Court found that Plaintiffs had standing to sue because Plaintiffs were engaging in self-censorship to avoid potential disciplinary action, which constituted a cognizable injury-in-fact that was *1206 fairly traceable to the Act and redressable by injunction. Id. at 1258-59. The District Court also held that Plaintiffs’ claims were ripe, finding that delayed review would “cause hardship to Plaintiffs, who would continue to engage in self-censorship,” and that further factual development of the issues was unnecessary. Id. at 1259.
Turning to the merits, the District Court found that the Act imposed a content-based restriction on practitioners’ speech on the subject of firearms. Id. at 1261. The District Court rejected the State’s argument that the Act “constitute^] a permissible regulation of professional speech or occupational conduct that imposed a mere incidental burden on speech.” Id. at 1262. The District Court noted that, unlike the provisions of the Act, “[s]uch regulations govern the access or practice of a profession; they do not burden or prohibit truthful, non-misleading speech within the scope of the profession.” Id.
The District Court then assessed the State’s asserted interests in passing the Act. The District Court acknowledged that the State has an interest in protecting its citizens’ Second Amendment right to keep and bear arms, but found that such a right is “irrelevant” to the Act and therefore is not “a legitimate or compelling interest for it.” Id. at 1264. The District Court found that, because the State acted on the basis of purely anecdotal information and provided no evidence that discrimination or harassment based on firearm ownership is pervasive, the State does not have a legitimate or compelling interest in protecting its citizens “from barriers to the receipt of medical care arising from [such] discrimination or harassment.” Id. (internal quotation marks omitted). However, the District Court found that Florida has legitimate — but “perhaps” not compelling — interests “in protecting patients’ privacy regarding their firearm ownership or use” and in the regulation of professions. Id. at 1265.
Balancing physicians’ free speech rights against the State’s legitimate interests in protecting patient privacy and regulating the professions, the District Court held that — regardless of whether strict scrutiny or some lesser standard applied — the inquiry, record-keeping, discrimination, and harassment provisions of the Act could not pass constitutional muster. Id. at 1265-67. The District Court found that the State had failed to provide any evidence that the confidentiality of information regarding patients’ firearm ownership was at risk, noting that a patient may simply decline to provide such information, and that state and federal laws pertaining to the confidentiality of medical records provide adequate protection to patients. Id. at 1267 (citing Health Insurance Portability and Accountability Act of 1996, Pub.L. No. 104-191, 110 Stat.1936 (providing, among other things, confidentiality of medical records); Fla. Stat. § 456.057 (same)). With regard to the regulation of professions, the District Court found that the Act lacked “narrow specificity,” id. at 1266 (internal quotation marks omitted), because the Act directly targets speech rather than merely imposing an incidental burden on speech. Id. at 1266-67. For similar reasons, the District Court further found that the Act is not the least restrictive means of achieving the State’s interests. Id. at 1267. Thus, the District Court held that the “balance of interests tip significantly in favor of safeguarding practitioners’ ability to speak freely to their patients.” Id. at 1267.
The District Court also held that the inquiry, record-keeping, and harassment provisions of the Act were unconstitutionally vague. Id. at 1267-69. With regard to the inquiry and record-keeping provisions, the District Court found that the *1207 “relevance standard” failed to provide sufficient guidance as to what conduct the Act prohibits. Id. at 1268. With regard to the harassment provision, the District Court noted that the term “harass” has an ordinary meaning that is readily clear, id., but that the “[w]hat constitutes ‘unnecessary harassment’ is left to anyone’s guess,” id. at 1269. The District Court noted that it did not need to address Plaintiffs’ argument that the Act is overbroad because doing so would not change the outcome. Id. at 1270 n. 7.
Thus, the District Court — finding the remaining provisions of the Act severa-ble — granted Plaintiffs motion for summary judgment, and granted in part and denied in part the State’s motion for summary judgment.[4] Id. at 1270. Accordingly, the District Court permanently enjoined the State from enforcing the record-keeping, inquiry, harassment, and discrimination provisions of the act, § 790.838(1), (2), (5), (6), and from enforcing § 790.338(8), to the extent that it provided that violations of § 790.338(1) and (2) constitute ground for disciplinary action, and § 456.072(l)(nn), to the extent that it provided that violations of § 790.338(1), (2), (5) and (6) constitute grounds for disciplinary action. Id.
On July 30, 2012, the State appealed the District Court’s judgment. The State contends that the District Court erred in holding Plaintiffs’ claims justiciable, because the Act does not prohibit physicians from asking patients about firearm ownership, providing firearm safety counseling, or recording information concerning patients’ firearm ownership. The State argues that physicians may engage in such conduct when it is relevant to patients’ care, and even when not relevant, the Act merely suggests that physicians “should refrain” from inquiring as to firearm ownership. § 790.338(2). Such hortatory language, the State argues, does not constitute a mandate that physicians must not inquire. Thus, the State argues, because the Act does not in fact actually prohibit the conduct Plaintiffs wish to engage in, Plaintiffs lack standing to challenge the Act because they have not demonstrated injury-in-faet. Moreover, the State argues, we have an obligation to read the Act as a mere recommendation that physicians refrain from irrelevant inquiry and record-keeping about firearms, in order to construe the Act as valid.
The State also argues that the District Court erred in holding that the Act imposes a facially unconstitutional content-based speech restriction, because the Act is a regulation of professional conduct that imposes only incidental burdens on speech, and because the discrimination and harassment provisions regulate conduct and cannot be challenged on free speech grounds. Even if the Act imposes more than an incidental burden on speech, the State argues, the Act should be upheld as a valid restriction on commercial speech because the Act is narrowly tailored to further substantial governmental interests in patient privacy, protecting Second Amendment rights, preventing barriers for firearm owners to receive medical care, and preventing harassment and discrimination of firearm-owning patients.
The State further contends that the District Court erred in holding the inquiry, record-keeping, and harassment provisions of the Act unconstitutionally vague because a plain meaning reading of the Act’s *1208 terms makes it reasonably clear what conduct is prohibited. Finally, the State argues that the Act is not overbroad because the inquiry and record-keeping provisions do not unconstitutionally prohibit any speech, and the discrimination and harassment provisions are indistinguishable from legitimate antidiscrimination statutes such as Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17 (1976), and the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213 (1994). Thus, the State contends, the District Court erred in granting summary judgment for Plaintiffs and enjoining the enforcement of the Act.
Plaintiffs argue that the District Court properly held Plaintiffs’ claims justiciable. Plaintiffs contend that their self-censorship constitutes a cognizable injury-in-fact because they wish to engage in speech that is at least arguably forbidden by the Act, the challenged provisions are at least arguably vague, and there is some minimal probability that the provisions will be enforced if violated. Plaintiffs contend that the “should refrain” language of the Act’s inquiry provision may not be interpreted as hortatory when physicians face discipline for its violation, and when the provision contains a safe-harbor clause that would be irrelevant if the provision were read as hortatory. Thus, Plaintiffs argue that they have standing.
On the merits, Plaintiffs argue that the Act is not properly understood as a regulation of professional medical conduct, because all four challenged provisions were enacted in response to — and were intended to prohibit — communications regarding firearm safety. Thus, Plaintiffs contend, the Act is an impermissible viewpoint-discriminatory restriction on speech, subject to strict scrutiny, which cannot be justified by any of the State’s proffered interests, and which in any case is not the least restrictive means of accomplishing the State’s objectives. Plaintiffs also argue that the Act is unconstitutionally vague because the statute does not define “relevant” in the inquiry and record-keeping provisions, and does not define “unnecessarily harassing” or “discrimination.” Finally, Plaintiffs argue, the Act is overbroad because it affects a wide swath of physicians’ daily interactions with patients, and appears to preclude even consented-to inquiries and recordation of information regarding firearms. Thus, Plaintiffs contend, we should affirm the District Court’s grant of summary judgment for Plaintiffs and issuance of an injunction against enforcement of the Act.
II.
We review a district court’s grant of summary judgment de novo. Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1363 (11th Cir.2007). “Summary judgment is appropriate when ‘there is no genuine issue of material fact and ... the moving party is entitled to a judgment as a matter of law.’ ” Id. (quoting Fed.R.Civ.P. 56(c)). A genuine issue of material fact exists “if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.” United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir.1991). “In making this determination, we review the record, drawing all reasonable inferences in the light most favorable to the nonmoving party.” Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1358 (11th Cir.1999). We also review de novo questions concerning our subject matter jurisdiction, such as standing and ripeness. Elend v. Basham, 471 F.3d 1199, 1204 (11th Cir.2006).
III.
A.
We find that the District Court properly held that Plaintiffs’ claims are *1209 justiciable. In order to have standing, “a claimant must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant’s challenged behavior; and likely to be redressed by a favorable ruling.” Davis v. Fed. Election Comm’n, 554 U.S. 724, 733, 128 S.Ct. 2759, 2768, 171 L.Ed.2d 737 (2008). However, “[sjtanding is not dispensed in gross. Rather, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought.” Id. at 734, 128 S.Ct. at 2769 (citations omitted) (internal quotation marks omitted).
At the outset, we note that Plaintiffs’ First Amendment challenge to the Act may be viewed as the functional equivalent of a First Amendment argument raised as an affirmative defense in a hypothetical case brought against a physician for asking irrelevant questions about firearms contrary to good medical practice. A physician could raise such a defense in a disciplinary proceeding brought under the Act for such conduct, or, for that matter, in a malpractice action brought in court for such conduct. For example, a patient could file a lawsuit alleging that a physician committed malpractice by unnecessarily harassing the patient about firearm ownership — just as a patient could potentially file a lawsuit alleging that a physician committed malpractice by unnecessarily harassing the patient about any other topic. The physician could choose to admit to the purportedly harassing speech and plead the First Amendment as an affirmative' defense, in effect contending that the court’s rejection of the affirmative defense would constitute state action in violation of the Constitution. Indeed, leaving aside the Act, a physician facing malpractice liability for a wide swath of professional activity involving speech could theoretically raise a First Amendment defense.
In mounting a facial challenge to the Act, however, Plaintiffs sought a First Amendment defense to any action brought against a physician based on speech targeted by the Act. The State contends that the only proper vehicle for Plaintiffs’ First Amendment defense is a live proceeding brought under the Act. In other words, in arguing that Plaintiffs’ facial challenge is not justiciable, the State is saying that Plaintiffs must wait until they have been subjected to discipline pursuant to the Act.
Crucial to resolving the standing question is the nature of Plaintiffs’ claims. “Under controlling case law, we apply the injury-in-fact requirement most loosely where First Amendment rights are involved, lest free speech be chilled even before the law or regulation is enforced.” Harrell v. The Fla. Bar, 608 F.3d 1241, 1254 (11th Cir.2010) (citing Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale, 922 F.2d 756, 760 (11th Cir.1991)).
Plaintiffs’ sole alleged injury is self-censorship, which may be a cognizable injury-in-fact for standing purposes. See id. (“[I]t is well-establishéd that ‘an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences.’ ” (quoting Pittman v. Cole, 267 F.3d 1269, 1283 (11th Cir.2001))).
For their First Amendment claims, to establish a cognizable self-censorship injury, Plaintiffs “must show that, as a result of [their] desired expression, (1) [they were] threatened with prosecution; (2) prosecution is likely; or (3) there is a credible threat of prosecution.” Id. at 1260 (internal quotation marks omitted). To establish that there is a credible threat of prosecution, Plaintiffs must demonstrate: “first, that [they] seriously wish[ ] *1210 to engage in expression that is ‘at least arguably forbidden by the pertinent law,’ and second, that there is at least some minimal probability that the challenged rules will be enforced if violated.” Id. (citations omitted). “If a challenged law or rule was recently enacted, or if the enforcing authority is defending the challenged law or rule in court, an intent to enforce the rule may be inferred.” Id. at 1257.
Plaintiffs explain that, as part of the practice of preventative care, some physicians routinely ask patients whether they own firearms — either verbally or via a screening questionnaire — and provide firearm safety counseling, as part of a larger battery of questions and counseling regarding health and safety risks (including, for example, poisonous chemicals in the home, alcohol, tobacco, and swimming pools). After passage of the Act, Plaintiffs have curtailed or eliminated this practice for fear of facing discipline.[5]
Plaintiffs have established that they wish to engage in conduct that is at least arguably forbidden by the Act. In their practice of preventative medicine, Plaintiffs wish to ask questions and record information regarding firearms as a matter of routine — without making a particularized determination of relevance — which implies that some such inquiry and recor-dation will not be relevant to the health and safety of patients or others and thus would be prohibited by the Act. The Act was recently enacted, and the State is defending it, so we may infer that there is at least some probability that the Act will be enforced if violated.[6] Thus, Plaintiffs *1211 have established a cognizable self-censorship injury for their First Amendment claims.[7]
For Plaintiffs’ vagueness claim, the test for establishing a cognizable self-censorship injury is similar. “[Plaintiffs] must establish that: (1) [they] seriously wish[] to [engage in speech], (2) such [speech] would arguably be affected by the rules, but the rules are at least arguably vague as they apply to [them], and (3) there is at least a minimal probability that the rules will be enforced, if they are violated.” Id. at 1254 (citations omitted). Notably, “it is the existence, not the imposition, of standardless requirements that causes [the] injury.” Id. (alteration in original) (quoting CAMP Legal Def. Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1275 (11th Cir.2006)).
For the reasons discussed above, Plaintiffs have met the first and third prongs. With regard to the second prong, Plaintiffs argue that it is unclear whether routine inquiries and record-keeping regarding firearms, made as part of the practice of preventative medicine and not based on patients’ particularized circumstances, qualify as “relevant” to health and safety, and that the law does not define the terms “unnecessarily harassing” or “discriminate,” leaving practitioners without guidance as to what conduct the Act prohibits and when physicians may be subject to discipline for conduct patients may unpredictably deem objectionable. Without determining, at this stage, the ultimate merits of Plaintiffs’ argument, we accept that the language Plaintiffs point to is at least arguably vague. Thus, Plaintiffs have established a cognizable self-censorship injury for their vagueness claim.
Plaintiffs claim that they curtailed their firearms inquiry and counseling practices due to the Act, and that they would resume those practices but for the Act. Thus, Plaintiffs’ self-censorship injury is fairly traceable to passage of the Act, and re-dressable by injunction. Accordingly, Plaintiffs have standing.
The State argues that Plaintiffs lack standing with regard to the inquiry provision of the Act because the provision in fact prohibits nothing at all. Thus, the State claims, Plaintiffs’ fear that they will face discipline is not objectively reasonable. See Wilson v. State Bar of Ga., 132 F.3d 1422, 1428 (11th Cir.1998) (“A party’s subjective fear that she may be prosecuted for engaging in expressive activity will not be held to constitute an injury for standing purposes unless that fear is objectively reasonable.”). Under the State’s proposed construction, the Act merely recommends that physicians “should refrain” from asking questions about firearms unless relevant, and that such hortatory language does not constitute a bar on speech. The State points out that the Executive Di *1212 rector of the Board stated in a letter— posted to the Board’s website shortly after Plaintiffs filed suit — that the Board does not interpret the inquiry provision as a prohibition, but rather as a recommendation (contradicting a letter the Executive Director had previously mailed to Florida physicians stating the opposite). Accordingly, the State contends, there is no credible threat of enforcement with regard to the inquiry provision.
We disagree. Laws — such as the Act — that provide for disciplinary action in case of violation should generally not be interpreted as hortatory. Compare Liesegang v. Sec’y of Veterans Affairs, 312 F.3d 1368, 1377 (Fed.Cir.2002) (“In the absence of any consequences for noncompliance, [a law’s] timing provisions are at best preca-tory rather than mandatory.”), with Kittay v. Kornstein, 230 F.3d 531, 538 n. 3 (2d Cir.2000) (noting that attorney disciplinary rules “are mandatory in character” because they “state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action” (internal quotation marks omitted)), and Edwards v. Born, Inc., 792 F.2d 387, 391-92 (3d Cir.1986) (noting that attorney disciplinary rules “are mandatory” because attorneys are subject to discipline for violating them). Thus, despite the Board’s position — insofar as the Executive Director’s letters represent it — that the inquiry provision constitutes a recommendation rather than a mandate, the fact that the Act provides for disciplinary action against Plaintiffs in case of a violation provides evidence that Plaintiffs’ fear that they may face discipline is objectively reasonable for standing purposes. Notably, this is not a generalized fear of disciplinary action, but rather a specific apprehension by a specific group — physicians-whose conduct the Act targets. But cf. Clapper v. Amnesty Int’l USA — U.S. -, 133 S.Ct. 1138, 1143, 185 L.Ed.2d 264 (2013) (holding that attorneys and various human rights, labor, legal, and media organizations cannot “manufacture standing” to challenge a provision of the Foreign Intelligence Surveillance Act of 1978 “by choosing to make expenditures based on hypothetical future harm” where plaintiffs merely speculate that the government will target their communications, and so the costs they incurred were a product of their generalized fear of surveillance).
Moreover, we note that Board has not been consistent in its position that the inquiry provision is hortatory, as indicated by the Executive Director’s first letter stating the contrary. The State is also inconsistent in its interpretation of the “should refrain” language in its briefs, repeatedly characterizing identical language in the harassment provision of the Act as a mandatory prohibition against unnecessary harassment, State’s Br. at 1, 6, 18, 27, 35 n.8, 39, and describing the inquiry provision itself as “proscribing] ... inquiries,” id. at 11, and “prohibiting] conduct: health care providers must not interrogate patients about firearms ... if it is not relevant to a patient’s medical care or safety, or the safety of others,” id. at 39 (emphasis added). But cf. Wilson, 132 F.3d at 1428-29 (holding disbarred attorneys lacked standing to challenge State Bar rules that limit the ways in which disbarred attorneys can represent themselves to the public or have contact with clients where “the State Bar ha[d] repeatedly and consistently taken the position that the [challenged rules] ha[d] no application to the types of scenarios the disbarred attorneys have posed”).
Neither is it controlling that — as the State contends — the Florida Supreme *1213 Court interpreted the term “should” as hortatory in reviewing Florida’s Code of Judicial Conduct. See In re Code of Judicial Conduct, 643 So.2d 1037, 1041 (Fla.1994). Such interpretation is irrelevant to determining what effect the Florida legislature intended to give language in the Act. Thus, Plaintiffs’ fear that they may face discipline under the inquiry provision is objectively reasonable.[8]
The State also argues that Plaintiffs lack standing with regard to the record-keeping provision of the Act because it only proscribes the entry of firearm information that is not relevant to medical care or safety, and Plaintiffs claim no injury arising from a wish to record irrelevant information. However, Plaintiffs claim an injury to their practice of preventative medicine arising from not being free to record the firearm information of every patient as a matter of course. Some— perhaps the majority — of these records will therefore be irrelevant to the care and safety of patients and others. Thus, the State’s argument is unavailing: Plaintiffs claim an injury arising, in part, from a desire to record irrelevant information.
Accordingly, we find that the District Court properly held that Plaintiffs’ have standing to challenge the Act. We also find that the District Court properly held that Plaintiffs’ claims are ripe for adjudication.[9]
B.
Before addressing the State’s other arguments, however, we must evaluate the Act in order to assess the interests at stake. The essence of the Act is simple: medical practitioners should not record information or inquire about patients’ firearm-ownership status when doing so is not necessary to providing the patient with good medical care. The Act’s harassment and discrimination provisions serve to reinforce these prohibitions.
As suggested by the complaints the Florida legislature received prior to passage of the Act, patients are aware that their answers to physicians’ inquiries will be entered into their medical record, and may fear that their record will be shared with third parties, including, for example, government bureaucrats.[10] We need not speculate as to the reasons a patient may *1214 have for objecting to the sharing of his or her firearm-ownership status, but we note that a patient might be concerned about disclosing to a physician information regarding any number of private topics when such information is not relevant to his or her medical care for similar reasons. For example, a patient may not wish to disclose his or her religious or political affiliations, sexual preferences, or bank account balance to a physician. The Act merely circumscribes the unnecessary collection of patient information on one of many potential sensitive topics. It does so as a means of protecting a patient’s ability to receive effective medical treatment without compromising the patient’s privacy with regard to matters unrelated to healthcare.
In the physician-patient relationship, a patient may need protection because there is an “imbalance of power between patient and physician.” American College of Physicians, Ethics Manual (6th ed.2012), available at http://www.acponhne.org/running_ praetice/ethics/manual/manual6th. htm#physician-patient. When a patient enters a physician’s office, the patient depends on the physician’s knowledge and submits to the physician’s authority, sometimes on matters of life and death. It is no exaggeration to state that a patient may be in some cases essentially at the mercy of his or her physician. As such, physicians bear a great responsibility toward their patients, and the relationship of patient to physician is one of trust and dependence, in which the patient consigns him — or herself to the physician’s care, and depends on the physician to act with integrity, fidelity, and competence. See John Ladd, Medical Ethics: Who Knows Best?, 316 The Lancet 1127, 1129 (1980) (“The physician’s power is awesome, and power carries responsibility.... Power, of course, presupposes trust and confidence.”).
The Dissent states that “[o]f course,” patients are free not to answer their doctors’ questions about firearms if they choose not to. Dissenting op. at 137. In support, the Dissent cites precedent holding that residents who wish not to answer questions from unwelcome visitors at their doorsteps receive “ ‘ample protection’ from [their] ‘unquestioned right to refuse to engage.’ ” Sorrell v. IMS Health Inc., — U.S. -, 131 S.Ct. 2653, 2670, 180 L.Ed.2d 544 (2011) (quoting Watchtower Bible & Tract Soc’y of N.Y., Inc. v. Vill. of Stratton, 536 U.S. 150, 168, 122 S.Ct. 2080, 2091, 153 L.Ed.2d 205 (2002)). But the Dissent’s assumption ignores the reality that when patients are in examining rooms, they may feel powerless vis-a-vis their physicians. So when physicians inquire about the presence of firearms in patients’ homes, some patients may feel that their physicians demand an answer. *1215 While an individual is certainly free to refuse to answer a question posed by another in the public square, a patient may not feel that same freedom when the question comes from his or her physician.
This is particularly true in circumstances in which a patient is especially powerless vis-a-vis his or her physician. For example, a patient in a rural area may have access to only a single physician. Without the option to seek treatment from a different physician, and without the protections imposed by professional codes of conduct and the law of malpractice, such a patient would have no recourse if the physician chooses to abuse the physician-patient relationship in some way — for instance by exploiting his or her authority over a patient for personal financial gain, to make inappropriate sexual advances, or, as we are concerned with here, to extract private information, for whatever reason, unrelated to the patient’s medical care.
Thus, at least in part to protect patients from physicians who abuse their position of power, physicians have long been subject to codes of conduct. In Classical Greece, the Hippocratic Oath — as it comes down to us today — required physicians to affirm their responsibilities by swearing that they will uphold a number of professional ethical standards, including that they will keep patients’ private information in confidence and “keep [patients] from harm and injustice.” Ludwig Edelstein, The Hippocratic Oath: Text, Translation, and Interpretation (1943), available at http://guides.hbrary.jhu.edu/content.php? pid=23699&sid=190555. Today, most graduating medical students swear to a modernized form of the Oath. Peter Tyson, The Hippocratic Oath Today, PBS (Mar. 27, 2001), http://www.pbs.org/wgbh/nova/ body/hippoeratic-oath-today.html.
Other modern ethical models abound. For example, the American Medical Association (the “AMA”) invites physicians to pledge to a Declaration of Professional Responsibility, which provides that physicians must, among other things, “[t]reat the sick and injured with competence and compassion and without prejudice” and “[p]rotect the privacy and confidentiality of those for whom [they] care and breach that confidence only when keeping it would seriously threaten their health and safety or that of others.” American Medical Association, Declaration of Professional Responsibility: Medicine’s Social Contract with Humanity (2001), available at http:// www.amaassn.org/resources/doc/ethics/ decofprofessionalpdf.
As the Hippocratic Oath and the AMA’s Declaration of Professional Responsibility suggest, the practice of good medicine should not require inquiry into private matters unless such inquiry is necessary for the practice of good medicine. What better way to protect patients’ privacy than to not inquire unnecessarily about private matters? The Act merely reaffirms the boundaries surrounding what constitutes good medical practice by codifying into law this common-sense proposition, and serves the important purpose of protecting the privacy rights of patients who do not wish to answer questions about irrelevant and private matters.
Insofar as Plaintiffs claim a generalized interest in being able to speak freely to their patients, such conversation (if not relevant to medical care) is outside the boundaries of the physician-patient relationship. Thus, insofar as Plaintiffs wish to make inquiries and keep records regarding firearm ownership as a matter of routine, even when not relevant to an individual patient’s case, the Act places such *1216 conduct outside of the bounds of good medical practice, recognizing that routine inquiries and record-keeping regarding firearm ownership are not within the province of medicine but are rather, perhaps, law enforcement issues.[11]
Plaintiffs’ ultimate concern, then, must lie in the close case: where it may be debatable whether a firearm inquiry is relevant to a given patient’s care. At one extreme, if a patient’s firearm-ownership status is plainly irrelevant to a patient’s care, it will be clear that the Act bars inquiry. At the other extreme, if good medical care clearly requires inquiry — for example, in case of a suicidal patient — the physician will know that inquiry is relevant and thus not barred. The close case lies somewhere in the middle, where a physician may be forced to act without definitive guidance as to whether or not his or her conduct falls within the bounds of good medical care.
This problem, however, is not unique to a physician’s decision regarding the propriety of firearm inquiries under the Act. A physician must continually make decisions regarding what constitutes appropriate care under the relevant professional standards, while running the risk that he or she may be subject to discipline or exposed to malpractice liability for making a poor decision. As leading bioethicists recognize,
[b]y entering into the profession of medicine, physicians accept a responsibility to observe the standards specific to their profession. If their conduct falls below these standards, they act negligently.... [However,] [t]he line between due care and inadequate care (that which falls below what is due) is often difficult to draw.
Tom. L. Beauchamp & James F. Childress, Principals of Biomedical Ethics 154-55 (6th ed.2009). Whether a physician’s transgression concerns unnecessary inquiry or record-keeping regarding private matters or anything else the State chooses to define as grounds for discipline, the law of malpractice — and the statutory disciplinary measures the Board is authorized to impose for violations of specific professional standards — remain the same. Likewise, under the Act, the challenge a physician faces in treating a patient remains the same: he or she must use professional judgment to determine what constitutes good medical care for that particular patient, and proceed accordingly. The Act merely delineates one factor — privacy re *1217 garding firearm ownership — in the physician’s calculation.
It does little to alter the analysis that the Act singles out a single factor as a trigger for discipline, nor that this factor involves what the legislature considers appropriate for physicians to ask or record about their patients. Even leaving aside statutory disciplinary measures such as the Act, a physician may face liability in state courts under malpractice or tort law for a wide swath of professional activity, much of which necessarily involves physicians speaking or failing to speak. Indeed, “doctors are routinely held liable for giving negligent medical advice to their patients, without serious suggestion that the First Amendment protects their right to give advice that is not consistent with the accepted standard of care.” Pickup v. Brown, 740 F.3d 1208, 1228 (9th Cir.2014).
For example, “[a] doctor may not counsel a patient to rely on quack medicine. The First Amendment would not prohibit the doctor’s loss of license for doing so.” Id. (internal quotation marks omitted). “When a drug is banned, ... a doctor who treats patients with that drug does not have a First Amendment right to speak the words necessary to provide or administer the banned drug.” Id. at 1229. A doctor might face malpractice liability for communicating an inaccurate diagnosis to a patient, or for failing to timely communicate an accurate diagnosis. A doctor might face malpractice liability for giving a patient improper instructions, or for failing to provide a patient with proper instructions. In all of these scenarios, a court might hold a doctor liable for actions which involve speech and, given such state action, presumably infringe the doctor’s First Amendment rights. With this in mind, we proceed to evaluate the Act’s constitutionality.
C.
We find that the Act is a valid regulation of professional conduct that has only an incidental effect on physicians’ speech. As such, the Act does not facially violate the First Amendment.[12] To define the standards of good medical practice and provide for administrative enforcement of those standards is well within the State’s long-established authority to regulate the professions. See generally Barsky v. Bd. of Regents, 347 U.S. 442, 449, 74 S.Ct. 650, 654, 98 L.Ed. 829 (1954) (holding that states may regulate “all professions concerned with health”); Semler v. Oregon State Bd. of Dental Exam’rs, 294 U.S. 608, 611, 55 S.Ct. 570, 571, 79 L.Ed. 1086 (1935) (“That the state may regulate the [professions] ... and to that end may ... establish supervision by an administrative board, is not open to dispute.”).
Moreover, as discussed above, and as Justice White observed in Lowe v. S.E.C., “[t]he power of government to reg *1218 ulate the professions is not lost whenever the practice of a profession entails speech.” 472 U.S. 181, 228, 105 S.Ct. 2557, 2582, 86 L.Ed.2d 130 (1985) (White, J., concurring in the result). Rather, “[a] statute that governs the practice of an occupation is not unconstitutional as an abridgement of the right to free speech, so long as any inhibition of that right is merely the incidental effect of observing an otherwise legitimate regulation.” Locke v. Shore, 634 F.3d 1185, 1191 (11th Cir.2011) (quoting Accountant’s Soc’y. of Va. v. Bowman, 860 F.2d 602, 604 (4th Cir.1988) (relying on Justice White’s reasoning in Lowe to uphold a state statute restricting the use of certain terms in the work product of persons not licensed as certified public accountants)).
As a general matter, of course, speech by professionals is not immune from the protections of the First Amendment. See, e.g., Fla. Bar v. Went For It, Inc., 515 U.S. 618, 634-35, 115 S.Ct. 2371, 2381, 132 L.Ed.2d 541 (1995). These protections are at their apex when a professional speaks to the public on matters of public concern; they approach a nadir, however, when the professional speaks privately, in the course of exercising his or her professional judgment, to a person receiving the professional’s services. As Justice White explained in the context of a licensing scheme for professional investment advisors,
One who takes the affairs of a client personally in hand and purports to exercise judgment on behalf of the client in the light of the client’s individual needs and circumstances is properly viewed as engaging in the practice of a profession. Just as offer and acceptance are communications incidental to the regulable transaction called a contract, the professional’s speech is incidental to the conduct of the profession.... Where the personal nexus between professional and client does not exist, and a speaker does not purport to be exercising judgment on behalf of any particular individual with whose circumstances he is directly acquainted, government regulation ceases to function as legitimate regulation of professional practice with only incidental impact on speech; it becomes regulation of speaking or publishing as such, subject to the First Amendment’s command that “Congress shall make no law ... abridging the freedom of speech, or of the press.”
Lowe, 472 U.S. at 232, 105 S.Ct. at 2584 (White, J., concurring in the result) (footnote omitted); see also Locke, 634 F.3d at 1191 (“There is a difference, for First Amendment purposes, between regulating professionals’ speech to the public at large versus their direct, personalized speech with clients.” (citing Lowe, 472 U.S. at 232, 105 S.Ct. at 2584 (White, J., concurring in the result))).
Thus, “[t]he key to distinguishing between occupational regulation and abridgment of [FJirst [A]mendment liberties is in finding ‘a personal nexus between professional and client,’ ” Bowman, 860 F.2d at 605 (quoting Lowe, 472 U.S. at 232, 105 S.Ct. at 2584 (White, J., concurring in the result)), where the professional is “exercising] judgment on behalf of the client in the light of the client’s individual needs and circumstances,” Lowe, 472 U.S. at 232, 105 S.Ct. at 2584 (White, J., concurring in the result).
Accordingly, we afford speech to the public “by attorneys on public issues and matters of legal representation the strongest protection our Constitution has *1219 to offer.” Went For It, Inc., 515 U.S. at 634, 115 S.Ct. at 2381 (citing Gentile v. State Bar of Nev., 501 U.S. 1030, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991)). At the opposite end of the spectrum, there is no “constitutional infirmity” where the speech rights of physicians are “implicated, but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State.” Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 884, 112 S.Ct. 2791, 2824, 120 L.Ed.2d 674 (1992) (plurality opinion of O’Connor, Kennedy, and Souter, JJ.) (citations omitted) (holding that a provision of a Pennsylvania statute requiring health care providers to inform patients of the availability of certain information regarding abortion and childbirth prior to obtaining an abortion was a valid regulation of the practice of medicine and so did not violate physicians’ First Amendment right not to speak).[13]
For example, in Locke we applied Justice White’s framework in Lowe in upholding a requirement that professional interi- or designers obtain a license to practice. Locke, 634 F.3d at 1191-92. We noted that, although the practice of interior design involves speech, the license requirement regulates only “professionals’ ... direct, personalized speech with clients.” Id. at 1191 (citing Lowe, 472 U.S. at 232, 105 S.Ct. at 2584) (White, J., concurring in the result). “Because of this ‘personal nexus’ between the designer and the client and because the designer is exercising judgment on behalf of the client in light of the client’s specific circumstances, Florida’s law is properly viewed as a legitimate regulation of professional practice.” Id. at 1197 (Black, J., concurring). Therefore, we held, “the license requirement governs occupational conduct, and not a substantial amount of protected speech, [and so] it does not implicate constitutionally protected activity under the First Amendment.” Id. at 1191 (majority opinion) (internal quotation marks omitted).
Insofar as the inquiry provision of the Act, § 790.338(2), regulates physician speech, it does so where the “personal nexus between professional and client” is perhaps at its most significant: within the confines of the physician’s examination room, where the physician exercises his or her judgment to deliver professional treatment and advice to a particular patient, tailored to that patient’s personal circumstances, in private. See Lowe, 472 U.S. at 232, 105 S.Ct. at 2584 (White, J., concurring in the result). Thus, although the Act restricts physicians’ ability to ask questions about firearm ownership when doing so would be irrelevant to patients’ medical care, it does so only in the service of defining the practice of good medicine, in the context of the very private, physician-patient relationship. The inquiry provision places no burdens whatsoever on physicians’ ability to speak outside the physician-patient relationship.[14] The Act simply informs physicians that inquiring about a *1220 private matter irrelevant to medical care is not part of the practice of good medicine, and that, as always, a physician may face discipline for not practicing good medicine. Therefore, the inquiry provision of the Act is a regulation of professional conduct that implicates physicians’ speech only “as part of the practice of medicine, subject to reasonable licensing and regulation,” and does not offend the First Amendment. See Casey, 505 U.S. at 884, 112 S.Ct. at 2824 (plurality opinion).
The Act’s record-keeping provision, § 790.338(1), is similarly a valid regulation of professional conduct. Here too, the Act regulates one aspect of the making of records within the confines of the physician-patient relationship. A medical record is merely a reduction to writing of a physician’s course of treatment of his or her patient, based on his or her professional judgment, and tailored to the patient’s personal circumstances. Thus, to the extent that the record-keeping provision implicates speech, it is non-public, personalized speech made by a physician in the course of using his or her professional judgment to care for a particular patient. Accordingly, insofar as the making of medical records has a speech aspect, it also occurs where the “personal nexus between professional and client” is at its most significant, and so the Act may regulate it without running afoul of the First Amendment. See Lowe, 472 U.S. at 232, 105 S.Ct. at 2584 (White, J., concurring in the result).
We acknowledge that a business’s record-keeping activities are not categorically excluded from the protections of the First Amendment. As Plaintiffs point out, in Sorrell v. IMS Health Inc., the Supreme Court held that “the creation and dissemination of information are speech within the meaning of the First Amendment”, 131 S.Ct. at 2667, and that “[a]n individual’s right to speak is implicated when information he or she possesses is subjected to ‘restraints on the way in which the information might be used’ or disseminated,” id. at 2665 (quoting Seattle Times Co. v. Rhinehart, 467 U.S. 20, 32, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984)). Thus, the Court found that a Vermont statute that restricted the sale, disclosure, and use for marketing purposes of pharmacy records that reveal prescribing practices of individual doctors imposed a content-based regulation on protected expression, and, applying heightened scrutiny, struck down the statute. Id. at 2672.
We note, however, that in Sorrell, the statute in question restricted the manner in which pharmacies could disseminate business records to third parties or use them in a way which involved communicating their contents to third parties. In contrast, the Act does not clearly prohibit the dissemination of information. Plaintiffs characterize the act of entering information in a patient’s record as “communicating in writing with the patient’s current and future care-providers.” Plaintiffs’ Br. at 32. However, whatever communicative function medical records serve is, with only limited exception, contained within the medical profession — physicians do not, of course, make medical records for public consumption. Moreover, what health care providers may do with medical records is, of course, already highly regulated. See, e.g., Health Insurance Portability and Accountability Act of 1996, Pub.L. No. 104-191, 110 Stat.1936; § 456.057. Thus, the reasoning of Sorrell is inapposite. The *1221 Act merely recognizes that good medical practice does not require the keeping of irrelevant records. Any burden the record-keeping provision may place on physicians’ ability to create information in the form of medical records or to communicate such information to other health care providers is incidental to the Act’s regulation of the practice of medicine.
The Act’s discrimination provision, § 790.338(5), also regulates professional conduct within the physician-patient relationship. Although physician discrimination could potentially involve speech, on balance discrimination involves conduct. To the extent that the discrimination provision does prohibit conduct involving physician speech, the same analysis applies as to its place within the private physician-patient relationship, where the “personal nexus between professional and client” is at its strongest. See Lowe, 472 U.S. at 232, 105 S.Ct. at 2584 (White, J., concurring in the result). Thus, the discrimination provision is also a valid regulation of professional conduct that only incidentally — if at all — affects physician speech.
The Act’s harassment provision, § 790.338(6), similarly targets professional conduct within the physician-patient relationship. Harassment can involve speech, but any speech that the harassment provision reaches is — like that involved in the Act’s other provisions — private, personalized speech between a physician and patient, involving the physician’s professional judgments and tailored to the patient’s individual circumstances. Of course, harassing speech may in some cases be protected by the First Amendment, such as when such speech is made in a public place regarding a matter of public concern. See Snyder v. Phelps, — U.S. -, 131 S.Ct. 1207, 1219, 179 L.Ed.2d 172 (2011) (holding that picketers at military funerals who held signs communicating their belief that God hates the United States for its tolerance of homosexuality were shielded by the First Amendment from tort liability because this activity constituted speech in “a public place on a matter of public concern”). Although we accept that firearm safety may be a matter of public concern, the reasoning of Snyder is inapposite in the context of a regulation of professional conduct that provides that the privacy of a physician’s examination room is not an appropriate forum for unrestricted debate on such matters. Thus, the harassment provision is also a valid regulation of professional conduct that only incidentally affects speech.
Plaintiffs argue that the cases establishing that professional regulations may incidentally burden speech without offending the First Amendment concern licensing and supervision requirements.[15] The purpose of these requirements, Plaintiffs ex *1222 plain, is to “shield[ ] the public against the untrustworthy, the incompetent, or the irresponsible, or against unauthorized representation of agency.” Thomas v. Collins, 323 U.S. 516, 545, 65 S.Ct. 315, 329, 89 L.Ed. 430 (1945) (Jackson, J., concurring). In contrast, Plaintiffs contend, the Act directly targets physicians’ speech about firearms and so any speech restriction cannot be merely incidental.
However, it is well-established “that a state’s legitimate concern for maintaining high standards of professional conduct extends beyond initial licensing.” Barsky, 347 U.S. at 451, 74 S.Ct. at 655. In Casey, the Supreme Court — although without invoking the “personal nexus” framework set forth in Justice White’s Lowe concurrence and applied by this Court in Locke — upheld a statutory provision that directly regulated physicians’ conversations with patients as a valid regulation of the practice of medicine. Casey, 505 U.S. at 884, 112 S.Ct. at 2824 (plurality opinion).[16] We are not convinced that a licensing requirement is the only form of *1223 professional regulation that may validly touch on professional speech.
In Pickup v. Brown, the Ninth Circuit invoked Casey together with Justice White’s Lowe concurrence in rejecting a First Amendment challenge to a statute that directly regulated what a healthcare provider may say to a patient. Pickup, 740 F.3d at 1227-29. In Pickup, plaintiffs — practitioners, advocacy organizations, patients, and patients’ parents— challenged a California statute that prohibited state-licensed mental health providers from engaging in therapy with a minor in an effort to change the minor’s sexual orientation. Id. at 1222-24. The Ninth Circuit upheld the statute as a valid regulation of professional conduct that has only “incidental effect on speech.” Id. at 1229.
In so holding, the Ninth Circuit recognized a “continuum” along which “the First Amendment rights of professionals, such as doctors and mental health providers” may be evaluated. Id. at 1227. The Ninth Circuit noted that “where a professional is engaged in a public dialogue,” this represents “the high end of the continuum, where First Amendment protection is greatest.” Id. (citing Lowe, 472 U.S. at 232, 105 S.Ct. at 2584 (White, J., concurring)). The Ninth Circuit placed the requirement that health care providers communicate certain information to patients that was challenged in Casey “[a]t the midpoint of the continuum,” noting that the speech at issue there took place “within the confines of a professional relationship.” Id. at 1228. Citing the reasoning of Justice White’s Lowe concurrence, the Ninth Circuit noted that:
Outside the professional relationship, such a requirement would almost certainly be considered impermissible compelled speech.... [However,] the First Amendment tolerates a substantial amount of speech regulation within the professional-client relationship that it would not tolerate outside of it. And that toleration makes sense: When professionals, by means of their state-issued licenses, form relationships with clients, the purpose of those relationships is to advance the welfare of the clients, rather than to contribute to public debate.
Id. at 1228-29 (citing Lowe, 472 U.S. at 232, 105 S.Ct. at 2584 (White, J., concurring)). The Ninth Circuit proceeded to locate the therapy prohibited by the California statute even lower on the continuum of First Amendment protections than the activity at issue in Casey, describing it as a “regulation of professional conduct, where the state’s power is great, even though such regulation may have an incidental effect on speech.” Id. at 1229.
However, the Ninth Circuit reached a different conclusion in an earlier case with regard to a federal policy that threatened physicians with administrative discipline— *1224 including revocation of a physician’s license — for recommending that a patient use medical marijuana, holding that this policy interfered with expression protected by the First Amendment. Conant v. Walters, 309 F.3d 629, 632 (9th Cir.2002).
In Pickup, the Ninth Circuit distinguished Conant by noting that in Conant, it was the policy against physicians recommending marijuana that offended the First Amendment. Pickup, 740 F.3d at 1226. The policy prohibiting physicians from prescribing or distributing marijuana was unchallenged. Id. Thus, “the demarcation between conduct and speech in Conant was clear.... [T]he policy against merely ‘recommending’ marijuana was both [a] content — and viewpoint-based” restriction on speech. Pickup, 740 F.3d at 1226. In Pickup, however, the Ninth Circuit held that the therapy targeted by the California statute was itself treatment, and so the statute “regulates conduct. It bans a form of treatment for minors; it does nothing to prevent licensed therapists from discussing the pros and cons of [sexual orientation change efforts] with their patients.” Id. at 1229.
Plaintiffs characterize the Act as regulating not treatment, as in Pickup, but speech per se, as in Conant. However, the line between treatment and communication about treatment is not necessarily so clear. In some cases, medical treatment — such as may occur when, for example, a physician attempts to help a patient cease smoking — may begin with an inquiry (“do you smoke?”), followed by a recommendation and some amount of counseling (“you should quit smoking because smoking has been shown to cause cancer”). In many cases, a physician’s efforts may go no further than this. Nevertheless, the physician would almost certainly characterize an attempt to convince a patient to cease smoking as part of his or her treatment of that patient.
Thus, although the Ninth Circuit chose to drawn a bright line between the recommendation at issue in Conant and the therapy at issue in Pickup, we do not find such a line here. A physician’s inquiry about the presence of firearms in a patient’s home may be viewed as the opening salvo in an attempt to treat any issues raised by the presence of those firearms. When a physician enters a patient’s firearm ownership status into the patient’s medical records — along with the rest of the patient’s course of treatment — this is part and parcel with the physician’s treatment of the patient. Moreover, under the Act, physicians remain largely free — up to the point of unnecessarily harassing a patient about the patient’s ownership of firearms — to discuss firearm safety, make recommendations with regard to firearm safety, and express opinions about firearms. Cf. Pickup, 740 F.3d at 1229 (“[T]he law allows discussions about treatment, recommendations to obtain treatment, and expressions of opinions about [sexual orientation change efforts] and homosexuality.”). The Act simply targets inquiry and record-keeping, along with related harassment and discrimination.
Furthermore, unlike the state statute at issue here (and the one upheld in Pickup), Conant involved a federal policy that purported to regulate physicians’ conduct, and in upholding an injunction against enforcement of the policy, the Ninth Circuit took into account that “states [are] the primary regulators of professional conduct.” Co-nant, 309 F.3d at 639.
Thus, we do not find that the reasoning of Conant mandates a different result in our analysis of the Act. Nor do we find *1225 Pickup inapposite because of the Ninth Circuit’s characterization of the therapy prohibited in Pickup as pure conduct deserving of even less First Amendment protection than the compelled disclosure at issue in Casey. Pickup is instructive as a recent example of a court applying Justice White’s reasoning in Lowe in conjunction with Casey to uphold a regulation of professional conduct with incidental effect on speech, outside of the context of a license requirement.
The Act as a whole “governs occupational conduct, and not a substantial amount of protected speech.” See Locke, 634 F.3d at 1191 (internal quotation marks omitted). Any burden the Act places on speech is thus incidental to its legitimate regulation of the practice of medicine.[17]
Moreover, the Dissent’s assertion that the Act violates the First Amendment because it targets and prohibits physicians’ speech on the topic of firearms is actually belied by the plain language of the Act itself. As noted, so long as physicians do not ask patients irrelevant questions about their firearm ownership, the Act nowhere prohibits physicians from discussing firearm safety with their patients, except in the case where such firearms counseling might rise to the level of unnecessary harassment prohibited by the Act. Indeed, a physician need not find out whether his patient owns a firearm in order to provide information to that patient on any possible health consequences that might go along with firearm ownership. A physician might offer such counseling by providing literature on firearm safety that does not make inquiries of patients or by briefly advising patients of safe firearms storing practices without demanding answers from patients as to whether they own firearms at home. Counseling, without inquiring, as long as it does not harass, maintains patients’ right to privacy regarding firearms and at the same time enables physicians to advise patients on safe practices. As such, the Act actually neither infringes on physicians’ rights to speak on a topic of their choosing nor infringes on the rights of those patients who would welcome information on firearm safety.
For the same reasons, we reject Plaintiffs’ argument that the Act is overbroad. “In the First Amendment context, ... a law may be invalidated as overbroad if ‘a substantial number of its applications are unconstitutional, judged in relation to the statute’s plainly legitimate sweep.’ ” United States v. Stevens, 559 U.S. 460, 473, 130 S.Ct. 1577, 1587, 176 *1226 L.Ed.2d 435 (2010) (quoting Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449, n. 6, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008)). “The overbreadth doctrine is ‘strong medicine’ that generally should be administered ‘only as a last resort.’” Locke, 634 F.3d at 1192 (quoting United States v. Williams, 553 U.S. 285, 293, 128 S.Ct. 1830, 1838, 170 L.Ed.2d 650 (2008)).
Plaintiffs argue that that Act is over-broad because it regulates every practitioner’s speech on the subject of firearms, and appears to preclude even consented-to inquiries or record-keeping regarding firearms. However, as discussed, the Act does not prohibit relevant inquiries and record-keeping, and the State may legitimately regulate the practice of medicine to exclude irrelevant inquiries and record-keeping. Because the Act “is a professional regulation with a merely incidental effect on protected speech, we cannot say that its impermissible applications are substantial relative to its plainly legitimate sweep.” Id. Thus, the Act is not over-broad.[18]
Accordingly, we find Plaintiffs’ claims that the Act facially violates the First Amendment without merit. The State may validly regulate the practice of medicine to protect patients’ privacy. Any speech that the Act reaches takes place entirely within the confines of the physician-patient relationship, where the “personal nexus between professional and client” is strong, and so is entirely incidental to the Act’s regulation of physicians’ professional conduct. See Lowe, 472 U.S. at 232, 105 S.Ct. at 2584 (White, J., concurring in the result).
In reaching this conclusion, we note that we are not curtailing Plaintiffs’ First Amendment rights. Plaintiffs remain free to assert the First Amendment as an affirmative defense in any proceeding brought against them based upon speech made in the course of treatment that fell outside the bounds of good medical care. By rejecting Plaintiffs’ facial challenge to the Act, we are simply refusing to provide Plaintiffs with a declaration that such a defense will be successful.
Thus, we hold that the District Court erred in finding that the Act facially violates the First Amendment.
D.
We also find that the Act is not unconstitutionally vague. Under “[t]he void-for-vagueness doctrine[,] ... ‘a statute which either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.’ ” Harris v. Mexican Specialty Foods, Inc., 564 F.3d 1301, 1310 (11th Cir.2009) (third alteration in original) (quoting Roberts v. U.S. Jaycees, 468 U.S. 609, 629, 104 S.Ct. 3244, 3256, 82 L.Ed.2d 462 (1984)). Thus, a statute is unconstitutionally vague if “it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and *1227 what is not in each particular case.” Giaccio v. Pennsylvania, 382 U.S. 399, 402-03, 86 S.Ct. 518, 520-21, 15 L.Ed.2d 447 (1966).
As an initial matter, we note that the Act provides only for civil penalties in the form of disciplinary action by the Board&emdash;physicians do not face criminal penalties for the Act’s violation. “The Supreme Court has warned against the mechanical application of vagueness doctrine, emphasizing that ... there should be ‘greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe.’ ” Harris, 564 F.3d at 1310 (quoting Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498-99, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982)).[19]
Plaintiffs argue that the record-keeping and inquiry provisions of the Act, § 790.338(1), (2), are vague because the Act does not provide sufficient notice as to when record-keeping or inquiry regarding firearms is “relevant” to medical care or safety. Plaintiffs note that the Act does not specify whether a physician must make a particularized finding of relevance for each patient or whether a physician’s general belief that firearms are always relevant will suffice, and does not specify if a physician must believe that firearm information is relevant at the time of inquiry and record-keeping, or if a good faith belief that the information may later become relevant (such as in the practice of preventative medicine) satisfies the requirements of the Act. Plaintiffs contend that, because a reading that information about firearms is always relevant would render the Act meaningless, physicians reasonably fear that the Act requires some higher, unspecified level of relevance. See In re Davis, 565 F.3d 810, 823 (11th Cir.2009) (“We cannot read statutory language in a way that renders it wholly meaningless or nonsensical.”).
We find recourse to plain meaning resolves the issue. “Relevant” means “[r]elated to the matter at hand; to the point; pertinent.” American Heritage Dictionary of the English Language 1098 (William Morris, ed., 1969). An ordinary person of common intelligence need not guess as to the meaning of the term. It is apparent that the Act’s relevancy standard is only vague insofar as “relevancy” is necessarily determined on a case-by-case basis&emdash;that is, whether information is related to the matter at hand depends entirely on the specifics of the matter at hand. A reading that firearms information is relevant in every case would, indeed, render the inquiry and record-keeping provisions superfluous, but this problem is easily avoided by adhering to a plain-meaning construction of relevancy as an ad hoc determination, requiring a physician to base his or her calculation as to the relevancy of a patient’s firearms ownership status on particularized information about the patient. By *1228 employing a flexible “relevancy” standard, the Act provides physicians with the freedom to make inquiries and record information regarding firearms whenever doing so would be part of the practice of good medicine.
For example, under the record-keeping provision, the Act prohibits recordation of firearm information only if the physician “knows” that the information is not relevant. § 790.338(1). This simply means that a physician may not record a patient’s firearm-ownership status unless the physician has knowledge that — because of some particularized information about the individual patient, for example, that the patient is suicidal or has violent tendencies-— the patient’s firearm-ownership status pertains to the patient’s medical care or safety, or the safety of others. Therefore, the record-keeping provision is not vague.
The key to the inquiry provision’s relevancy clause is that a physician must believe in “good faith” that firearm ownership information is relevant to medical care or safety. § 790.338(2). Thus, a physician may make firearms inquiries of any or all patients, so long as he or she does so with the good faith belief — based on the specifics of the patient’s case — that the inquiry is relevant to the patient’s medical care or safety, or the safety of others. If, for example, the physician seeks firearm information to suit an agenda unrelated to medical care or safety, he or she would not be making a “good faith” inquiry, and so the Act plainly directs him to refrain from inquiring. Thus, the inquiry provision is not vague.
Plaintiffs argue that the discrimination provision of the Act, § 790.338(5), is vague because the Act does not define “discrimination.” Plaintiffs point out that, given the context of the Act’s passage,[20] one might expect this provision to prohibit a physician from terminating his or her care of a patient based on the patient’s refusal to answer questions about firearm ownership, but that another, unchallenged provision of the Act makes it explicit that the Act does not alter the rule that a physician is free to cease providing services to a patient for any reason. See § 790.338(4) (“A patient’s decision not to answer a question relating to the presence or ownership of a firearm does not alter existing law regarding a physician’s authorization to choose his or her patients.”). Thus, Plaintiffs contend, physicians are left to guess what activity would be prohibited by the discrimination provision.
We agree with the District Court that the term “discriminate” has an ordinary meaning that is readily clear to persons of common intelligence. In this context, “discriminate” means “[t]o act on the basis of prejudice.” American Heritage Dictionary of the English Language, supra, at 376. Under this plain-meaning reading, the discrimination provision of the Act simply means that physicians may not provide a lower level of medical care on the basis of a patient’s firearm-ownership status. Although the particulars may vary — a physician could discriminate against firearm-owning patients by, for example, making them wait an excessively long time for an appointment, or by refusing them equal opportunities for referrals to specialists— the discrimination provision is sufficiently clear in apprising physicians that they may not provide firearm-owning patients with *1229 less medical care than they would other patients, in any circumstances. Thus, the discrimination provision of the Act is not vague.
Finally, Plaintiffs argue that the harassment provision of the Act, § 709.338(6), is vague because the Act does not define “unnecessarily harassing.” Plaintiffs contend that patients may hold diverse views as to what constitutes unnecessary harassment. Plaintiffs argue that what conduct is prohibited thus depends on what a particular patient understands it to be, and that the resulting uncertainty as to what the Act prohibits “is not permissible under the First Amendment.” See Conant, 309 F.3d at 639 (holding a statute providing for administrative action against physicians who engage in speech that “the patient believes to be a recommendation of marijuana” lacks the requisite narrow specificity under the First Amendment) (citing Collins, 323 U.S. at 535, 65 S.Ct. at 325 (striking on First Amendment grounds a statute criminalizing solicitation of membership for certain unions without state license because the statute did not distinguish between solicitation and. advocacy, and so “put[ ] the speaker ... wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning”)).
However, the term “harass” has an ordinary meaning that is readily clear to persons of common intelligence: “harass” means “[t]o disturb or irritate persistently.” American Heritage Dictionary of the English Language, supra, at 600. When read in the context of the Act as a whole, the harassment provision communicates that health care providers should not disparage firearm-owning patients, and should not continue over a patient’s objection to attempt to speak to the patient about firearm ownership when not relevant to medical care or safety. Like the other provisions ■ of the Act, the harassment provision targets physicians who wish to pursue an agenda unrelated to medical care or safety.
Although the District Court found that the modifier “unnecessarily” rendered the harassment provision vague, we disagree. The modifier in fact allows physicians the freedom to challenge — i.e., “harass” — patients regarding firearms when doing so is necessary for health or safety reasons, even if the patient might find the physicians’ advice unwelcome. For example, if a patient is suicidal, a physician may wish to attempt to persuade the patient to remove firearms from the patient’s home, even if the patient initially objects. Even if the patient considers the physician’s health and safety advice related to firearms harassing, the inclusion of the modifier “unnecessary” leaves room for physicians to deliver, such advice when necessary, consistent with the Act’s other provisions.
Plaintiffs’ fears that physicians may face discipline for offending a patient’s subjective sensibilities are therefore unfounded. Leaving aside that Conant and Collins did not turn on vagueness challenges, we note that patients by themselves cannot subject physicians to discipline. Patients may file a complaint which triggers an investigation by the Board, or they may bring a malpractice action, but so long as a physician is operating in good faith within the boundaries of good medical practice, and is providing only firearm safety advice which is relevant and necessary, he or she need not fear discipline at the hands of the Board or a money judgment in a court of law. Thus, the harassment provision of the Act is not vague.
*1230 Persons of “common intelligence” need not guess as to the meaning of any of the four challenged provisions of the Act. See Harris, 564 F.3d at 1310. Thus, we hold that the District Court erred in finding the record-keeping, inquiry, and harassment provisions void for vagueness.
IV.
Accordingly, we REVERSE the District Court’s grant of summary judgment in favor of Plaintiffs, and VACATE the injunction against enforcement of the Act.
SO ORDERED.

. Act of April 26, 2011, 2011 Fla. Laws 112 (codified at Fla. Stat. §§ 381.026, 456.072, 790.338).

. During the debates leading up to passage of the Act, legislators cited several incidents. For example, in a widely publicized incident that took place in Ocala, a pediatrician, during a routine visit, asked a patient’s mother whether she kept any firearms in her home. Because she felt that the question constituted an invasion of her privacy, the mother refused to answer. The pediatrician then terminated their relationship and advised the mother that she had thirty days to find a new doctor.
In another incident, a mother was separated from her children while medical staff asked the children whether the mother owned firearms. In another, physicians refused to provide medical care to nine-year-old "because they wanted to know if [the child's family] had a firearm in their home.” Doc. 87, at 3. In another example, a legislator stated that, during an appointment with his daughter, a pediatrician asked that the legislator remove his gun from his home.
Another legislator reported a complaint from a constituent that a health care provider falsely told him that disclosing firearm ownership was a Medicaid requirement. At a March 8, 2011, hearing held by the Florida House Criminal Justice Subcommittee, Marion Hammer of the National Rifle Association reported several similar incidents, including one involving a family that had been falsely advised by a pediatrician’s office that Medicaid would not pay claims if the family did not answer questions regarding firearm ownership.

. The full text of the challenged provisions is as follows:
(1) A health care practitioner licensed under chapter 456 [of the Florida Statutes] or a health care facility licensed under chapter 395 [of the Florida Statutes] may not intentionally enter any disclosed information concerning firearm ownership into the patient’s medical record if the practitioner knows that such information is not relevant to the patient’s medical care or safety, or the safety of others.
(2) A health care practitioner licensed under chapter 456 or a health care facility licensed under chapter 395 shall respect a patient’s right to privacy and should refrain from making a written inquiry or asking questions concerning the ownership of a firearm or ammunition by the patient or by a family member of the patient, or the presence of a firearm in a private home or other domicile of the patient or a family member of the patient. Notwithstanding this provision, a health care practitioner or health care facility that in good faith believes that this information is relevant to the patient’s medical care or safety, or the safety of others, may make such a verbal or written inquiry....
(5) A health care practitioner licensed under chapter 456 or a health care facility licensed under chapter 395 may not discriminate against a patient based solely upon the patient’s exercise of the constitutional right to own and possess firearms or ammunition.
*1205 (6) A health care practitioner licensed under chapter 456 or a health care facility licensed under chapter 395 shall respect a patient’s legal right to own or possess a firearm and should refrain from unnecessarily harassing a patient about firearm ownership during an examination....
Fla. Stat. § 790.338.
The Act also contains related provisions concerning emergency medical personnel and insurance companies, affirming the right of patients to decline to answer physician questions, and affirming that the-Act does not alter existing law regarding a physician’s authorization to choose patients. § 790.338(3), (4), (7). Plaintiffs do not appear to challenge these provisions, and, as the District Court held, because these provisions do not apply to practitioners or do not regulate any conduct by practitioners, Plaintiffs lack standing to challenge them.

. The District Court granted the State’s motion for summary judgment with respect to the provisions of the Act that neither apply to practitioners nor regulate any conduct by practitioners, § 790.338(3), (4), (7), finding that Plaintiffs’ lacked standing to challenge these provisions. Wollschlaeger, 880 F.Supp.2d at 1258.

. Plaintiffs’ Complaint lays out the specifics of individual physicians’ practices regarding firearm inquiries and safety counseling. For example, prior to passage of the Act, Dr. Wollschlaeger asked his patients to complete a questionnaire that included questions regarding firearm ownership, and routinely orally asked patients whether they owned firearms if other risk factors were present — such as when patients had children in the home, were suffering from addiction, depression, or suicidal ideation, had an unstable family environment, or were involved in a domestic-violence situation — to provide firearm safety counseling tailored to the patient’s circumstances. After passage of the Act, Dr. Wollschlaeger has removed the firearms-related questions from his questionnaire and no longer orally asks questions regarding firearm ownership or discusses firearms as part of his standard preventative counseling.
The other physicians who are party to this suit have limited their practice of asking questions and providing counseling about firearm safety, but still do so to varying degrees. For example, prior to passage of the Act, Dr. Schaechter and Dr. Schectman routinely asked their patients questions regarding firearm ownership and entered related information into their medical records. They have continued this practice even after passage of the Act because they believe in good faith that such questions and information are relevant to their patients' care. However, they now refrain from asking follow-up questions when patients or their parents seem upset by the initial screening question, when, prior to passage of the Act, they would not have refrained. Similarly, Dr. Gutierrez continues to use a patient questionnaire that includes a question about firearm ownership, but has resolved to refrain from asking any follow-up questions should a patient initially appear disinclined to discuss the topic. Dr. Sack has ended his previous practice of beginning his firearm safety counseling by asking patients whether they have a firearm in the house. However, he has continued to provide firearm safety counseling, framing it in hypothetical terms not tailored to his patients’ individual circumstances. Dr. Fox-Levine has, since passage of the Act, removed questions regarding firearm ownership from her intake questionnaire, but continues to advise some patients about firearm safety, framing her advice in hypothetical terms.

. We note that the Act does not provide for criminal penalties, but only disciplinary action by the Board. Nevertheless, for standing *1211 purpose, the threat of disciplinary action may be sufficient. See Harrell, 608 F.3d at 1248, 1260 (finding an attorney had standing to challenge the state bar’s attorney advertising rules, when the consequence for noncompliance was disciplinary action, such as disbarment).

. We acknowledge that the harassment and discrimination provisions of the Act in particular, § 790.338(5) and (6), prohibit conduct that may involve little to no speech. Nevertheless, Plaintiffs claim self-censorship as a result of all four challenged provisions of the Act. As all four challenged provisions regulate conduct that could arguably involve speech, even if only incidentally, this is sufficient for standing purposes. We need not, of course, evaluate the merits of these claims at the standing stage.

.We do not accept the State’s argument that construing the inquiry provision’s "should refrain” language as hortatory would render meaningless the portion of the provision allowing physicians to nevertheless make firearm inquiries when doing so would be relevant to care and safety. See Corley v. United States, 556 U.S. 303, 129 S.Ct. 1558, 1566, 173 L.Ed.2d 443 (2009) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.” (internal quotation mark omitted)). Even if we were to construe the inquiry provision as a mere recommendation that physicians refrain from inquiring about firearms, it is perfectly reasonable that the legislature may wish to withdraw this recommendation should the inquiry be relevant in a given case. Nevertheless, we find that the inquiry clause is not a mere recommendation, and our rejection of the State's argument does not alter the result of our standing inquiry.

. The State does not renew on appeal its argument that Plaintiffs’ claims are not ripe. Thus, we will not address the issue in detail.

. Plaintiffs argue that existing federal and state law sufficiently protects the confidentiality of medical records. Under regulations promulgated pursuant to the federal Health Insurance Portability and Accountability Act of 1996, Pub.L. No. 104-191, 110 Stat.1936, covered health care providers may not disclose health information except to an enumerated list of entities. 45 C.F.R. § 164.502. Florida law provides that a patients’ medical records must be kept confidential and enumerates only limited circumstances in which *1214 a health care provider may share a patient’s records with a third party. Fla. Stat. § 456.057(7)(a). Thus, Plaintiffs contend, patients’ fears that their firearm-ownership status will be shared with third parties are unfounded and the Act is unnecessary, insofar as its purpose is to protect the confidentiality of patients’ firearm-ownership status.
Nevertheless, the Florida legislature perceived a particular problem surrounding the eliciting and recording of firearm ownership information by physicians, and passed the Act in response. It is not our place to pass on the wisdom of the legislature’s motivations, nor — ■ at this stage — to evaluate the extent to which the Act furthers the legislature’s stated interests. See City of New Orleans v. Dukes, 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976) ("[T]he judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines....”).

. Plaintiffs contend that physician inquiries about firearm ownership comply with professional medical standards, even in situations (presented by the practice of preventative care) where such inquiries may initially appear irrelevant to medical care or safety. Several medical associations — including the AMA, and those associations that are party to this suit — have policies that endorse physicians’ practice of asking questions and providing counseling regarding firearms. See, e.g., Brief for American Medical Association, et al., as Amici Curiae Supporting Plaintiffs/Appellees at 21-22 (citing American Medical Association Policy H-145.990, Prevention of Firearm Accidents of Children).
We observe that these policies may be in conflict with the AMA's Declaration of Professional Responsibility, which, as noted, mandates respect for patient privacy. In any case, it is well-established that Florida may regulate professional standards of medical care within its borders — regardless of what medical associations may recommend. See, e.g., Barsky v. Bd. of Regents, 347 U.S. 442, 449, 74 S.Ct. 650, 654, 98 L.Ed. 829 (1954) ("It is elemental that a state has broad power to establish and enforce standards of conduct within its borders relative to the health of everyone there.... The state’s discretion in that field extends naturally to the regulation of all professions concerned with health.’’).

. We note that, insofar as individual Plaintiffs are concerned that their particular practice of asking questions about firearm ownership and providing individualized firearm safety counseling (in the manner that they did prior to the Act’s passage) constitutes a “close case,” they may seek an advisory opinion from the Board to determine whether they will face discipline for engaging in that practice. Florida law provides that "[a]ny substantially affected person may seek a declaratory statement regarding an agency’s opinion as to the applicability of a statutory provision, or of any rule or order of the agency, as it applies to the petitioner’s particular set of circumstances.” Fla. Stat. § 120.565(1). Plaintiffs do not, however, challenge the Act here as applied to their specific conduct, but rather argue that the Act is invalid on its face.

. The section of Planned Parenthood of Southeastern Pennsylvania v. Casey upholding the Pennsylvania statute's informed consent provision, which required physicians to provide patients with certain information prior to obtaining an abortion, is found in the plurality opinion written by Justices O’Connor, Kennedy, and Souter. 505 U.S. 833, 881-85, 112 S.Ct. 2791, 2822-25, 120 L.Ed.2d 674 (1992). However, both Chief Justice Rehnquist— joined by Justices White, Scalia, and Thomas — and Justice Scalia — joined by Chief Justice Rehnquist and Justices White and Thomas — wrote separately to concur in upholding this provision. Id. at 967, 981, 112 S.Ct. at 2867, 2875.

. For example, a physician would not face discipline under the Act for giving a lecture, *1220 publishing a pamphlet, or speaking to a person who is not a patient about firearm safety.

. The Dissent would have the reasoning as to why a state may regulate a professional’s personalized, one-to-one speech with a client as part of its regulation of the profession — as set forth in Justice White’s concurrence in Lowe v. S.E.C., 472 U.S. 181, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985), and cited in our decision in Locke v. Shore, 634 F.3d 1185 (11th Cir.2011) — apply only where the law at issue is a licensing scheme regulating entry into the profession, the incidental impact on speech is felt only by unlicensed, would-be practitioners, and the burden on speech is content-neutral.
We do not find the reasoning set forth in Justice White’s Lowe concurrence and in Locke valid only in such a narrow context. As we have explained, see supra section III.B, it is uncontroversial that a state may impose discipline on professionals for all manner of activity that involves the professional speaking with a client. Justice White’s concurrence in Lowe merely helps explain why this is so. Casey affirms that states may directly *1222 regulate what physicians say to their patients “as part of the practice of medicine.” 505 U.S. at 884, 112 S.Ct. at 2824 (plurality opinion). Finally, as we will discuss in more detail, the Ninth Circuit has already drawn a line from Justice White’s reasoning in Lowe to the informed consent provision the Supreme Court upheld in Casey, and invoked this reasoning in upholding a state statute that directly regulates what physicians may say to their patients. See Pickup v. Brown, 740 F.3d 1208, 1227-29 (9th Cir.2014).

. Of course, the Supreme Court upheld the informed consent provision of the Pennsylvania statute at issue in Casey on several other grounds, including that the information the provision requires physicians to provide regarding abortion and childbirth is truthful and non-misleading, that the provision furthers an important interest in protecting the life of the unborn, and that the provision did not "not prevent the physician from exercising his or her medical judgment,” which the Court attributed to the statute's safe harbor, under which a physician need not provide the information if doing so would adversely affect the health of the patient (not unlike the safe harbor of the Act's inquiry provision, under which physicians may inquire as to firearms when doing so is relevant to medical care or safety). See Casey, 505 U.S. at 881-87, 112 S.Ct. at 2822-26 (plurality opinion).
We do not mean to imply that the instant case is analogous. However, the Court’s First Amendment analysis of the informed consent provision in Casey — that the State may to some extent regulate physician speech within the confines of the physician-patient relationship "as part of the practice of medicine” without violating the First Amendment, see id. at 884, 112 S.Ct. at 2824 (plurality opinion) — • stands on its own, and applies here, despite the fact that the Act prohibits inquiries and record-keeping about irrelevant information, rather than requires discussion of relevant information. That the Pennsylvania statute's informed consent provision required the disclosure of truthful, non-misleading information and did not interfere with physicians’ judgment was not, as Plaintiffs suggest, the basis for the Court’s determination that the provision did not violate the First Amendment. Rather, the Court considered these factors in determining, respectively, that the statute did not impose an undue burden with regard to obtaining an abortion, and did not "interfere[] with a constitutional right of privacy between a pregnant woman and her physician.” Id. at 883, 112 S.Ct. at 2823-24 (plurality opinion).
The Dissent suggests that the Court in Casey, without explaining that it was doing so, applied intermediate scrutiny in reviewing the informed consent provision. However, the language the Dissent cites to support this reading of Casey is, as discussed above, directed at other issues and is set forth in the opinion before the Court turned to its discussion of the First Amendment, noting that the First Amendment issue was "[a]ll that is left of petitioners’ argument” and then dispatching of that argument in a short paragraph explaining that there is “no constitutional infirmity” because the provision reaches physician speech only as part of a reasonable regulation of the practice of medicine. Id. at 885, 112 S.Ct. at 2823-24 (plurality opinion).
The Dissent also suggests that, even if Casey applied something less than intermediate *1223 scrutiny, Casey involved compelled speech whereas the Act involves a prohibition on speech, and so a more exacting test is required here. See Zauderer v. Office of Disciplinary Counsel of Sup. Ct. of Ohio, 471 U.S. 626, 651, 105 S.Ct. 2265, 2282, 85 L.Ed.2d 652 (1985) (subjecting a provision of disciplinary rules prohibiting certain subject matter in attorney advertising to intermediate scrutiny and a provision compelling inclusion of certain subject matter to a less demanding “reasonably related to the State’s interest” standard). However, we do not find this distinction compelling. Zauderer involved a regulation of attorney advertising to the public and not of, as here, a professional’s one-on-one interaction with his or her client. Moreover, a state’s interest in regulating the practice of medicine is no less important when a state prohibits physician activity than when it compels physician activity.

. In reaching this conclusion, we are not, as the Dissent claims, declaring "a new category of speech immune from First Amendment review.” Dissenting op. at 1237. As discussed above, see supra section III.B, our holding simply recognizes that a state may — -just as it routinely does in state court malpractice and tort actions — impose discipline on a physician for activities that the state deems bad medicine even when those activities involve the physician speaking, and that when a state does so the First Amendment generally does not provide the physician with a shield.
Neither are we, as the Dissent suggests, creating a rule whereby any law burdening speech — such as a law barring doctors from discussing the Affordable Care Act, Medicare/Medicaid, medical malpractice laws, or any other topic — will avoid First Amendment scrutiny so long as the law applies within the confines of a one-on-one professional relationship. We note that the Act does not ban discussion of any topic, but only irrelevant inquiry, record-keeping, and related harassment and discrimination. In any case, we must decide this case based on the facts before us, and in doing so we need not — indeed, we must not — speculate as to the constitutionality of hypothetical laws.

. Because it would not alter our holding, we need not address the State's argument that the discrimination and harassment provisions of the Act are not overbroad because these provisions are indistinguishable from valid antidiscrimination regulations such as Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17 (1976), and the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213 (1994).

. Plaintiffs point out that the Supreme Court has held that "a content-based regulation of speech ... raises special First Amendment concerns because of its obvious chilling effect on free speech." Reno v. Am. Civil Liberties Union, 521 U.S. 844, 871-72, 117 S.Ct. 2329, 2344, 138 L.Ed.2d 874 (1997). Thus, if a "law interferes with the right of free speech ..., a more stringent vagueness test should apply.” Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499, 102 S.Ct. 1186, 1193-94, 71 L.Ed.2d 362 (1982). However, because the Act is not a content-based regulation of speech but rather a regulation of professional conduct that only incidentally impacts speech, we need not apply a more stringent version of our vagueness analysis.

. In particular, Plaintiffs point out that the Act was in large part passed in response to the incident in Ocala in which a pediatrician terminated care of a patient because the patient's mother refused to answer the pediatrician's questions regarding firearm ownership.